UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
JUL 0 9 2007
EUGENE R. WEDOFF
BANKRUPTCY JUDGE

| | |
|---|---|
| **Christopher Keith Salvino and Suzanne Mary Salvino,** ) ) ) ) **Debtors** ) ) ———————————————— ) ) **WISH Acquisition, LLC** ) ) **Plaintiff,** ) ) v. ) ) **Christopher Salvino,** ) ) **Defendant.** ) ) | **Chapter 7** <br><br> **Case No. 05-B-61546** <br><br><br><br><br> **Adv. Pro. No. 06-A-1092** |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for judgment after trial. The plaintiff, WISH Acquisition ("Acquisition") asserts that defendant Christopher Salvino owes it debts that are nondischargeable in his Chapter 7 bankruptcy case pursuant to § 523(a)(2) and (6) of the Bankruptcy Code (Title 11, U.S.C.). These provisions except from discharge debts that arose from false representations or are for willful and malicious injuries. As discussed below, Acquisition has not established that any debts owed by Salvino are nondischargeable. First, the only false representations that Acquisition proved were not shown to have resulted in a debt. Second, the only debt that Acquisition did prove at trial—arising from breach of an employment contract—was not shown to have arisen from a willful and malicious injury. Although there is authority to the contrary, the better reading of the Bankruptcy Code is that the

willful and malicious injury exception applies only to claims arising from tortious conduct, not from simple breaches of contract. Accordingly, judgment will be entered in favor of Salvino.

### Jurisdiction

Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over bankruptcy cases. Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred its bankruptcy cases to the bankruptcy court of this district. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. Acquisition's adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations of dischargeability), and this court may therefore enter a final judgment.

### Findings of Fact

In 1992, three doctors—Christopher Salvino, Jeffrey Rosen, and Claudio Alperovich—formed Midwest Surgical Consultants. In 1996, the doctors began performing bariatric (weight reduction) surgeries. (Trial Tr. 1/29 at 66-69.) By 2002, the number of surgeries the doctors were performing had increased dramatically (*id.* at 74), and, in response to the increased demand, the doctors formed WISH Holding, LLC ("Old Wish"), through which they opened new surgical centers around the country (*id.* at 67, 72). Salvino served as President and CEO of Old Wish. (*Id.* at 70.)

Old Wish's business model was built on rapid expansion (*id.* at 73-74), which it financed with loans from American Chartered Bank (*id.* at 77). By March 2004, Old Wish had a term loan in the amount of $2.5 million and a revolving line of credit in the amount of $4 million with the bank. (Acquisition Ex. 12, at 1, 9.) These loans were secured by Old Wish's ac-

counts receivable, its interest in certain real estate, and personal guarantees from Salvino, Rosen, and Alperovich. (*Id.*; Acquisition Ex. 13.)

In January 2005, Old Wish defaulted on these loans. (Acquisition Trial Ex. 24.) In response to the default, Joseph Chiariello, the bank's principal loan officer on the Old Wish's account, called a meeting with Rosen and Alperovich. (Trial Tr. 1/29 at 238.) Chiariello told the two doctors at this meeting that the bank intended to accelerate the notes. (*Id.* at 240-41.) Chiariello also told the doctors that Old Wish's account receivables did not support the loan balances and that the bank would contact the FBI if the doctors did not bring the loans current, liquidate the company, or find a buyer to acquire the debt. (*Id.* at 241-44, 252.) The meeting resulted in a Modification and Standstill Agreement. (Acquisition Ex. 26.) This agreement called for Salvino's resignation as CEO, his replacement by Rosen, the retention of a collection agency, and implementation of a lockbox for receipts. (*Id.* at 3-8.)

In an effort to pay the bank debt without liquidation, Old Wish located two potential investors, Com Vest Partners ("Com Vest") and Incubator Investments ("Incubator"). (Trial Tr. 1/29 at 116, 120.) Stephen Winslett, a partner at Com Vest, performed due diligence on Old Wish for the investors. (Trial Tr. 1/30 at 15.) In February 2005, after initial due diligence, Com Vest and Incubator agreed to purchase a $500,000 participation in Old Wish's debt, and the bank responded by extending the standstill agreement. (*Id.* at 23-24.) As the due diligence continued after February, Com Vest and Incubator purchased further loan participations. (*Id.*)

During the due diligence and at various times thereafter, Salvino told Com Vest that he would stay with the company for 3 to 5 years. (Trial Tr. 1/29 at 126; Trial Tr. 1/30 at 25.) Throughout these discussions, the investors made it clear that they would not invest without Salvino's promise to stay with the company. (Trial Tr. 1/30 at 25.)

3

After completing his due diligence, Winslett recommended against investing in Old Wish. (*Id.* at 20-21; Acquisition Trial Ex. 30.) Winslett noted that Old Wish had significant problems with billing, that accounts receivables were overstated, and that the company was poorly managed. (Trial Tr. 1/30 at 20-21.) Winslett also believed that an investment in Old Wish would have required funding beyond the investors' financial abilities. (*Id.* at 21.)

Despite Winslett's conclusions, Com Vest and Incubator decided to acquire Old Wish's business, and they formed Acquisition to purchase both the remainder of Old Wish's bank debt and the assets of Old Wish itself. (Acquisition Ex. 66.) During subsequent negotiations regarding Acquisition's purchase, Salvino asked the bank to release the doctors from any fraud claims arising from their dealings with the bank. (Acquisition Ex. 56, 68, 69.) The bank did not do so. (Acquisition Ex. 70.)

Also in conjunction with the debt purchase, Salvino executed an employment contract that included a five-year commitment to stay with the company. (Acquisition Ex. 72.) In this contract, Acquisition agreed to forgive all but $1.5 million of Salvino's personal guaranty of the bank loan. (Acquisition Ex. 73.) The debt purchase closed on April 22, 2004, and on the same day, Old Wish filed a Chapter 11 bankruptcy case to facilitate Acquisition's purchase of Old Wish's assets. (Trial Tr. 1/30 at 119.)

Before the bankruptcy filing, Salvino sought alternative employment with other companies. (Trial Tr. 1/29 at 105.) He entered into an employment contract with iVOW, a competitor of Acquisition, on April 11, 2005. (Acquisition Ex. 47, 51.) A few days before the April 22 bankruptcy filing, however, Salvino withdrew his signed employment contract with iVOW. (Acquisition Ex. 51.) Salvino did not disclose his search for alternative employment to Acquisition. (Trial Tr. 1/29 at 138.)

On July 14, 2005, the bankruptcy court approved the sale of Old Wish's assets to Acquisition. (Acquisition Ex. 85.) Thereafter, in August 2005, Acquisition agreed to amend Salv-

4

ino's employment contract. (Acquisition Ex. 87.) The amended contract, backdated to April 22, 2005, retained Salvino's five-year employment commitment, but released him from the remaining $1.5 million personal guaranty and inserted a liquidated damages clause. (*Id.* at 19.) Under this provision, damages were fixed at $1,500,000 if Salvino terminated the contract without breach by Acquisition during the first year of the contract term, at $1,125,000 during the second year, at $750,000 during the third year, and at $375,000 during fourth year. (*Id.*)

On September 7, 2005, Acquisition purchased Old Wish's assets. (Acquisition Ex. 88, 89.) Within seven days of the asset purchase closing, Salvino sought employment as a Trauma Director at John C. Lincoln Hospital. (Acquisition Ex. 98; Trial Tr. 1/29 at 188, 201.) Salvino did not disclose this employment search to Acquisition. (Trial Tr. 1/30 at 197-98.)

After the asset purchase, Acquisition was unable to stabilize the business; it failed to address the problems detailed in Winslett's due diligence report—faulty billing software, collection problems, and ineffective management. (*Id.* at 132, 203, 245-247; Trial Tr. 1/31 at 8-9, 25-26, 45-46, 55-56.) By March 2006, the Acquisition's owners decided to stop funding the company. (Trial Tr. 1/30 at 160-61.) Acquisition asserts, without dispute from Salvino, that after winding up its business it will recover no more than $1.4 million of a total investment of approximately $10.5 million, a loss of more than $9.1 million. (Acquisition Post Trial Br. 16-17, 46.)

Meanwhile, on October 14, 2005, Salvino and his wife filed the pending Chapter 7 bankruptcy petition, seeking a discharge of their personal debts, including Salvino's liability under the liquidated damages provision of his employment contract with Acquisition. (Acquisition Ex. 118.)

On February 4, 2006, Salvino accepted part-time employment as Trauma Director at John C. Lincoln Hospital and, effective March 1, 2006—within the first year of his employ-

5

ment contract with Acquisition—started working in this new position full-time. (Acquisition Ex. 137; Trial Tr. 1/29 at 219.)

### Conclusions of Law

Under § 727(a) of the Bankruptcy Code, the pre-bankruptcy debts of an individual Chapter 7 debtor like Christopher Salvino are subject to a broad discharge, defined by § 524(a). However, some types of debt—those listed in § 523(a)—are excepted from this discharge. These debts are said to "nondischargeable," even though, pursuant to § 523(c), debts of the kind described in § 523(a)(2), (4), and (6) may be discharged unless a timely complaint to determine dischargeability is filed in the bankruptcy case.

Determining dischargeability under § 523(a) is a two-part exercise. First, the creditor must establish a claim giving rise to a "debt" under applicable non-bankruptcy law. "Debt" is defined in § 101(12) of the Code as liability on a claim, and *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20-21 (2000), holds that the validity of claims in bankruptcy, including the quantum of proof needed to establish a claim, is determined under non-bankruptcy law. Second, the creditor must show that a claim established under non-bankruptcy law falls within one of the categories listed in § 523(a), and on that issue bankruptcy law imposes on the creditor the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In this case, Acquisition filed a timely complaint to determine the dischargeability under § 523(a)(2) and (6) of alleged debts of Salvino for misrepresentation and breach of contract. As discussed below, however, Acquisition failed to prove at trial that any misrepresentation by Salvino caused a loss under Illinois law, the applicable non-bankruptcy law in this

6

case.[1] Accordingly, there is no need to consider whether a claim arising from misrepresentation would be nondischargeable under § 523. And although Acquisition did prove a claim arising from Salvino's breach of the employment contract, in the amount $1.5 million, it failed to establish that this contract debt is nondischargeable under either § 523(a)(2) or (6).

1. *The claim for misrepresentation—the absence of a non-bankruptcy debt.*

Under Illinois law, a fraudulent misrepresentation gives rise to a claim if the following elements are proven: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). Proof by clear and convincing evidence is required. *Ray v. Winter*, 367 N.E.2d 678, 682-83 (Ill. 1977); *Power v. Smith*, 786 N.E.2d 1113, 1117 (Ill. App. Ct. 2003).

Acquisition established the first four of these elements by clear and convincing evidence. Salvino does not dispute that he repeatedly told Acquisition that he was committed to working for the enterprise for five years. Salvino asserts that he made this representation honestly—that he really did intend to work with Acquisition when he promised to do so and that his investigations of other job prospects was merely precautionary, undertaken as a hedge against the possibility that Acquisition would not go through with its purchase of Old Wish. The evidence, however, supports Acquisition's view—that Salvino intended employment by Acquisition simply as an option, which he would pursue only in the absence of a better opportunity. He continuously sought such better opportunities, both during the time Acquisition negotiated its purchase of Old Wish and after the purchase was consummated; he took pains

---

[1] The parties both cite Illinois law in their arguments and have not suggested that any other law might apply. *See In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir.1993) ("Where . . . the parties do not make an issue of choice of law, [the court has] no obligation to make an independent determination of what rule would apply if they had made an issue of the matter.").

7

to ensure that Acquisition knew nothing of his alternative job seeking; and he accepted employment in violation of his promises shortly after beginning employment with Acquisition. All of this activity makes it highly likely that Salvino knowingly misrepresented his real intent by giving an unconditional promise to work for Acquisition for five years. Thus, the first two elements of a false representation claim—falsity and knowledge—were established.[2]

Moreover, given the circumstances in which the representation was made—with Salvino and his fellow doctors greatly interested in Acquisition's purchase, so as to relieve themselves of liability to the bank on their guarantees—the third element, intent, was also established. Salvino plainly made the representations with the intent of causing Acquisition to go forward with its investment. Finally, Acquisition's reliance on Salvino's representation—the fourth element—is evident from Acquisition's repeated statements, both orally and in writing, that it would not have purchased Old Wish's business without Salvino's commitment to work for the business for five years.[3]

Although Illinois law generally does not allow recovery for a false representation of present intent to take action in the future, there is an exception for a situation in which such a

---

[2] In contrast, a second misrepresentation alleged by Acquisition was not established. Acquisition asserted that Salvino failed to disclose that American Chartered Bank, Old Wish's pre-bankruptcy lender, had accused him of fraudulently managing the business of Old Wish. There was no direct evidence that the bank actually made such an allegation; its threat to seek an FBI investigation and its refusal to release Salvino and his fellow doctors from fraud claims are as likely to have been negotiating strategies as an indication that the bank believed Salvino had been dishonest in his management. But equally important, the failure to disclose a fact—as opposed to an affirmative misrepresentation—is only actionable under Illinois law if the defendant is "under a duty to disclose that fact to plaintiff." *DeLuna v. Burciaga.* 857 N.E.2d 229, 246 (Ill. 2006) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996)). Acquisition did not show that Salvino had any duty of disclosure at the time Acquisition was considering its purchase of Old Wish.

[3] For example, Salvino's employment contract notes that his entering into the contract is a condition for Acquisition to proceed with the purchase and contains Salvino's acknowledgement "that the continued success of the business . . . will depend on [his] remaining employed by [Acquisition] for at least the Initial Term [of five years]." (Acquisition Ex. 87 at 1, 13, 19.)

8

false representation is part of scheme employed to accomplish a fraud. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989); *Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 826 N.E.2d 970, 978 (Ill. App. Ct. 2005). Here, such a scheme—to advance Acquisition's purchase of Old Wish—was established.

However, Acquisition failed to prove the final element of a claim for misrepresentation, damages. To establish damages for a misrepresentation inducing an investment, Illinois law requires that the investor show not merely that it would have foregone the investment in the absence of the misrepresentation (that is, the misrepresentation caused the investment), but also that the investor would not have suffered a loss had the representation been true (that is, the misrepresentation caused the loss). This distinction is thoroughly discussed in *Martin v. Heinhold Commodities, Inc.*, 643 N.E.2d 734, 747-48 (Ill. 1994), which sets out the following test: "Would the decline in plaintiff's investment have occurred even if defendant's misrepresentation had been true? If the answer to this question is 'yes,' plaintiff has failed to prove that the misrepresentation proximately caused the decline."[4] The decision goes on to note that the required proof of "loss causation" serves to ensure "that defendants, even when an intentional tort is committed, do not become insurers of plaintiffs who make unwise investments." *Id.*

Acquisition failed to prove the loss causation that Illinois law requires. There is a substantial possibility that Acquisition would have suffered the loss of its investment even if Salvino had honored his employment representations. Indeed, Acquisition's own due diligence expert warned that the problems with Old Wish's operations—with billing, collections, accounts receivable, and poor management—would likely be beyond the ability of the investors to cure, and the actual difficulties experienced by Acquisition following its purchase were not

---

[4] The decision cites William Prosser, *The Law of Torts* § 110 at 732 (4th ed. 1971), as the source of this formulation. The formulation itself does not appear in the cited location, but its substance does: "In general . . . courts have restricted recovery to those damages which might foreseeably be expected to follow from the character of the misrepresentation itself."

9

shown to be connected so much to Salvino's departure as to absentee management and neglect by Acquisition itself.

Recognizing that it might not be able to obtain its investment loss as damages for Salvino's misrepresentation, Acquisition alternatively suggests that it is entitled to liquidated damages under its contract. However, Acquisition cites no Illinois law suggesting that contractual liquidated damages can substituted for the "loss causation" required to establish a claim for misrepresentation. The claim arising under Illinois contract law is a separate issue, addressed below.

Acquisition's failure to prove damages proximately caused by Salvino's statements regarding his intent to work is fatal to its claim for misrepresentation under Illinois law, and thus provides fails to create a debt that could be nondischargeable under any provision of the Bankruptcy Code.

2. *The claim for breach of contract—a debt dischargeable under the Bankruptcy Code*

a. *The debt.* Acquisition's contract claim is simple: Salvino agreed to work for Acquisition for five years, and he breached the contract by resigning without cause in less than a year. For such a breach, Salvino's employment contract specifies liquidated damages of $1.5 million.

Salvino concedes all of this. His only defense to the breach of contract claim is that (as with its claim of misrepresentation) Acquisition did not prove damages. Salvino asserts that Illinois law, which governs the employment contract, does not allow enforcement of the contract's liquidated damage provision, so that proof of actual damages—which Acquisition did not present—was required.

However, Salvino is mistaken. Contractual provisions fixing damages are enforceable in Illinois as long as "the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is

incapable or very difficult of accurate estimation." *Bauer v. Sawyer*, 134 N.E.2d 329, 333 (Ill. 1956) (quoting Restatement of Contracts § 339 (1932)); *Tomei v. Tomei*, 602 N.E.2d 23, 27 (Ill. App. Ct. 1992). Acquisition reasonably viewed the services of Salvino and the other doctors as essential to the success of a $10 million investment. Liquidated damages of $1.5 million were thus within a reasonable range of the loss that deprivation of Salvino's services was capable of causing. But at the same time, it would be very difficult to prove how much loss resulted from services that were not performed. Indeed, the Illinois Supreme Court has long recognized that personal service contracts particularly call for liquidated damages, since the unique value of personal services cannot easily be calculated. *See Advance Amusement Co. v. Franke*, 109 N.E. 471, 472 (Ill. 1915) (noting that it is "especially difficult to ascertain the amount of damages for . . . breach . . . where one has agreed to give his personal services to another for a certain length of time and repudiates the contract").[5]

There is no basis for Salvino's suggestion that damages must be limited to the additional compensation that Acquisition might have had to pay for substitute services. The decision cited to support this proposition, *Med+Plus Neck & Back Pain Ctr., S.C. v. Noffsinger*, 726 N.E.2d 687, 693 (Ill. App. Ct. 2000), dealt with a breach of employment contract by a trainee, whose services could readily be replaced. Indeed, the liquidated damage clause rejected in that case was based on the readily calculable cost of training the employee. Here, Salvino had special experience in creating and expanding the bariatric surgery practice that Acquisition intended to conduct, his services were reasonably seen as non-fungible and essential to Acquisition's business, and the employment contract so provided.[6]

---

[5] The difficulty of assessing damages here is obvious. Even with the benefit of hindsight, it is not possible to determine to what extent Acquisition may have been able to reduce its losses if Salvino had honored his employment contract.

[6] There is also another point of contrast: In *Med+Plus*, the amount of liquidated damaged declined over time, even though, since more training was being provided to the em-

11

Thus, Acquisition established that Salvino owes a debt of $1.5 million for breach of his employment contract.

b. *Dischargeability.* Acquisition failed, however, to establish that Salvino's debt for breach of his employment contract is nondischargeable under either of the Bankruptcy Code provisions that it relies on.

i. *Fraud.* Section 523(a)(2)(A) excepts from discharge a debt for "money, property, services, or an extension, renewal, or refinancing of credit" to the extent that these items of value were obtained by "false pretense, a false representation, or actual fraud." But even though Salvino's misrepresentations about his intent to work for Acquisition may have led Acquisition to enter into the employment contract (as discussed above), his later breach of the contract was not a fraud or misrepresentation. Moreover, as much as it may have resulted in harm to Acquisition, Salvino's breach of the employment contract did not result in his obtaining any of the items (money, property, services, credit) that are the predicate for nondischargeability under § 523(a)(2)(A). *See Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007) ("A plain reading of [§ 523(a)(2)] demonstrates that Congress excepted from discharge not simply any debt incurred as a result of fraud but only debts in which the debtor used fraudulent means to obtain money, property, services, or credit."). To the contrary, by breaching his employment contract, Salvino actually gave up the compensation he would otherwise have received. By its terms, then, § 523(a)(2)(A) does not apply to the debt that arose from Salvino's breach of his employment contract.

---

ployee, the damages incurred should have increased. This inverse relationship between actual and liquidated damages indicated that that the liquidated damage clause was not a reasonable estimate of actual damages, but a penalty. 726 N.E.2d at 693. The liquidated damage clause in Salvino's contract, to the contrary, reasonably provided for declining damages as Salvino provided more of the services on which the business depended.

    ii. *Intentional breach of contract.* Section 523(a)(6) excepts from discharge debts for "willful and malicious injury by the debtor to another entity or to the property of another entity." Whether Acquisition's $1.5 million claim for breach of contract is nondischargeable under this provision depends on the extent to which "willful and malicious injury" encompasses intentional breaches of contract. The circuits are split on this question.

  The Fifth Circuit holds that any breach of contract is nondischargeable as a willful and malicious injury if the debtor either intended to injure the other party to the contract by breaching it or if injury to the other party was "substantially certain" to result from the breach; tortious conduct is not required. *See In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003) ("[D]ischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort . . . .").

  The Ninth Circuit, on the other hand, holds that "to be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.'" *In re Jercich*, 238 F.3d 1202, 1206 (9th Cir. 2001). Unreported decisions from the Sixth and Tenth Circuits are similarly split.[7] The Seventh Circuit has not addressed the question.[8]

---

[7] *Compare In re Sanders*, No. 99-6396, 2000 WL 328136 (10th Cir. Mar. 29, 2000) (tortious conduct not required for "willful and malicious injury" under § 523(a)(6)) *with In re Best*, No. 03-5098, 2004 WL 1544066 (6th Cir. June 30, 2004) (breach of contract unaccompanied by tortious conduct cannot be a "willful and malicious injury"). An unpublished decision of the Fifth Circuit holds, contrary to *Walker*, that tortious conduct is required for § 523(a)(6) nondischargeability, citing *Jercich* for that rule. *In re Deasy*, No. 02-11200, 2003 WL 21018189 at *1 (5th Cir. Apr. 18, 2003) ("[A] bare breach of contract claim fails, as a matter of law, to establish . . . a 'willful and malicious injury' for purposes of § 523(a)(6).").

[8] In *In re Hallahan (N.I.S. Corp. v. Hallahan)*, 936 F.2d 1496 (7th Cir. 1991), the Seventh Circuit affirmed a judgment of nondischargeability under § 523(a)(6) arising out of breach of a covenant not to compete. However, whether § 523(a)(6) requires tortious conduct was not one of the issues presented by the appeal and was not discussed by the court. *See Hallahan*, 936 F.2d at 1499 (listing the issues presented).

For several reasons, the better reading of § 523(a)(6) is the one requiring tortious conduct as an essential element of a "willful and malicious injury."

*First*, as the Supreme Court noted in *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), the phrase "willful and malicious injury" is one that "triggers in the lawyer's mind the category 'intentional torts.'"[9] Indeed, the common use of "willful and malicious" has been to describe conduct warranting punitive damages in tort cases. As Prosser explained (in the edition current at the time the Bankruptcy Code was enacted):

> Something more than mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interest of others that his conduct may be called willful or wanton.

William Prosser, *The Law of Torts* § 2 at 9-10 (4th ed. 1971) (citations omitted).

On the other hand, the common law treats willfulness and malice as irrelevant in contract cases, where punitive damages are generally held to be unavailable.

> The traditional goal of the law of contract remedies has not been compulsion of the promisor to perform his promise but compensation of the promisee for the loss resulting from breach. "Willful" breaches have not been distinguished from other breaches, punitive damages have not been awarded for breach of contract, and specific performance has not been granted where compensation in damages is an adequate substitute for the injured party.

Restatement (Second) of Contracts, ch. 16, introductory note (1981); *cf. Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 547 (1903) (Holmes, J.) ("The motive for the breach commonly is immaterial in an action on the contract."); *R & H Trucking v. Occidental Fire & Cas. Co. of N.C.*, 441 N.E.2d 816, 819 (Ohio App. Ct. 1981) ("It is well settled in this state that

---

[9]The narrow holding of *Geiger* is that negligent or reckless torts (in that case, medical malpractice) are not willful and malicious injuries within the scope of § 523(a)(6). However, the reasoning used in the opinion has often been cited to support a reading that excludes non-tortious conduct as well. *See, e.g., In re Harland*, 235 B.R. 769, 779 (Bankr. E.D. Pa. 1999).

punitive damages are not recoverable in an action for breach of contract, even though it is alleged that the breach was unlawful, wilful, wanton, and malicious.").

Thus, the common application of "willful and malicious" strongly suggests its limitation to torts, making nondischargeable in bankruptcy only debts arising from the sort of conduct that the common law discourages by punitive damages.

*Second*, before the enactment of § 523(a)(6) in the 1978 Bankruptcy Code, a "willful and malicious injury" exception from discharge was set out in § 17(a)(8) of the Bankruptcy Act of 1898, and was applied only in situations of tortious conduct. *See Cadillac Vending Co. v. Haynes (In re Haynes)*, 19 B.R. 849, 851 & n.6 (Bankr. E.D. Mich. 1982) (discussing the relevant Act provisions and their judicial interpretation). One of the last reported decisions applying § 17(a)(8), *In re Barton*, 465 F. Supp. 918, 924 (S.D.N.Y. 1979), summarized the case law under the 1898 Act as follows:

> Many earlier decisions under this provision, and under a similar provision in section 17(a)(2) respecting willful and malicious conversion, have limited its application to cases sounding in tort, not in contract. 1A Collier ¶ 17.17 at 1650.3 (citing cases). Others have questioned this compartmentalized construction of the section. Yet it is instructive that decisions holding liabilities formally grounded in contract nondischargeable by force of section 17(a)(8) have involved, in some respect, recognizable intentional torts such as are regularly deemed comprehended within the section.

By reenacting the "willful and malicious injury" standard for nondischargeability, Congress presumptively intended to continue the established practice of limiting its application to tortious conduct. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . ."). There is nothing in the language of § 523(a)(6) or its legislative history to rebut this presumption.[10]

---

[10] The legislative history of the 1978 Code suggests that Congress intended § 523(a)(6) to overrule the intent standard applied by the Supreme Court in *Tinker v. Colwell*, 193 U.S. 473, 487 (1904) (holding that a wrongful act of the debtor necessarily causing injury may be

15

*Third*, applying the common law definition of "willful and malicious" to contract claims renders § 523(a)(6) broadly destructive of the bankruptcy discharge. The common law standard encompasses not only actual intent to harm but also intentional acts that the defendant believes are substantially certain to cause harm. *See* Restatement (Second) of Torts, § 8A, Comment *b* (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."). This standard, as noted above, was not developed in connection with contract breaches, since under the common law the intent underlying a contract breach was immaterial. But if the standard is applied to contracts under § 523(a)(6), it would encompass a broad range of debts typically discharged in bankruptcy. For example, a debtor who fails to pay rent undoubtedly knows that the landlord will be injured by the nonpayment, and most debtors would likely acknowledge that even failure to make credit card payments is substantially certain to harm the credit card issuer. Indeed, nearly all breaches of contract resulting in claims of nonpayment would be "willful and malicious" under the tort standard, in that the debtor knows that there is a contractual duty to pay, chooses not to fulfill that duty (in order to make other payments), and knows that injury to the creditor will follow. Treating breaches of contracts as willful and malicious injuries would thus dramatically expand the number of nondischargeable debts and diminish the scope of the bankruptcy discharge. The Supreme Court recognized the implausibility of this result when it included "knowing breach

---

within the scope of the Bankruptcy Act's "willful and malicious" discharge exception, even if the debtor did not intend the injury). *See In re Long*, 774 F.2d 875, 879 n.4 (8th Cir. 1985) (citing relevant authority). However, there is nothing in the legislative history suggesting an expansion of the scope of "willful and malicious injury" to encompass claims that do not involve tortious conduct.

of contract" among the items that could be encompassed by an erroneously overbroad interpretation of "willful and malicious." *Geiger*, 523 U.S. at 61.[11]

*Fourth*, making intentional breaches of contract nondischargeable under § 523(a)(6) would create substantial tension with § 365 of the Bankruptcy Code. Section 365(a) authorizes a debtor in possession to reject executory contracts and unexpired leases that do not produce a benefit for the debtor's estate. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 117 (Bankr. D. Del. 2001) ("[T]he ability to reject an executory contract is rooted in the principle of maximizing the return to creditors by permitting a debtor in possession to renounce title to and abandon burdensome property if such action is in the best interests of the estate."). However, the rejection of an executory contract is a breach (as specified by § 365(g)), always intentional, that will almost certainly harm the other party (since a contract burdensome to the estate is likely beneficial to that party). Thus, if § 523(a)(6) applied to contracts, the Code would punish under that provision the very conduct that it encourages under § 365(a)—intentional breaches of contract that maximize the value of the debtor's property. Such a reading would violate the principle that statutes should be construed to make their various sections cohere with one another in advancing a legislative purpose. *In re Haynes*, 19 B.R. at 852 (citing *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974)).

All of these considerations—language, history, policy and context—compel the conclusion that a breach of contract not involving tortious conduct is outside the scope of § 523(a)(6). Thus, Salvino's breach of his employment contract, standing alone, fails to generate nondischargeability under § 523(a)(6).

---

[11] The Court stated: "A construction so broad would be incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.' *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)." *Geiger*, 523 U.S. at 62.

*iii. Breach of a fraudulently induced contract.* The authorities that interpret § 523(a)(6) to require tortious conduct acknowledge that such conduct may be involved in a breach of contract. The Ninth Circuit's *Jercich* decision, for example, addressed a failure to pay wages (a breach of contract) that a state statute made tortious. *In re Jercich*, 238 F.3d 1202, 1206-07 (9th Cir. 2001). Another example—the most common circumstance of a breach of contract constituting a tort—is the debtor's conversion of property that is collateral for a loan. *See, e.g., In re Long*, 774 F.2d 875, 881-82 (8th Cir. 1985) (discussing the circumstances in which conversion of collateral may result in willful and malicious injury). Salvino's breach of his employment contract might be said to involve tortious conduct, at least indirectly. As noted above, his misrepresentation about intending to work for Acquisition led Acquisition to enter into its investment in Old Wish's business, and Acquisition entered into the employment contract with Salvino as part of that investment.

For two reasons, however, Salvino's breach of the employment contract—even in the context of the misrepresentation—did not constitute a willful and malicious injury under § 523(a)(6). First, breach of the contract was not itself tortious. As noted in *Rutherford v. AT&T Communications of Mountain States, Inc.*, 844 P.2d 949, 974 (Utah 1992), "The common law of tort expresses public policy, the scope of which is not generally determined by reference to privately contracted obligations." Unlike nonpayment of wages in *Jercich* or the conversion of collateral, there is no suggestion here that breach of a personal service contract is a violation of any public policy. To the contrary, the contract was a heavily negotiated private agreement in which Acquisition was free to take whatever steps it chose to protect its interests; the public policy concerns of tort law are not involved in the breach of this contract. *Cf. In re Haynes*, 19 B.R. at 852 ("The vast majority of contracts are entered into for reasons of pecuniary gain, and the foreseeable consequences of breach are also pecuniary. Thus, a party may intentionally breach a contract with the knowledge that an injury may result, but the

18

nature of the injury is in large part foreseeable and assumed as a part of the risk of doing business."). To be sure, the falsity of Salvino's representations that he intended to work for Acquisition for five years was demonstrated in part by his breach of the contract, but only the misrepresentations, not the breach, were tortious.

Second, consistent with the role of § 523(a)(6) in enforcing the public policy underlying tort law, the debt resulting from a tortious breach of contract is only nondischargeable to the extent that tort law so provides, which may be much less than the amount of contract damages. The distinction can be seen most clearly in the situation of converted collateral, where the debt excepted from discharge is not the amount due on the defaulted contract but the value of the converted collateral. The leading decision on this issue explains the rationale for the rule:

> Section 523(a)(6) is based on tort principles rather than contract. It is designed to compensate the injured party for the injury suffered while not allowing the debtor to escape liability for a "willful and malicious" injury by resort to the bankruptcy laws. Thus, the appropriate measure for non-dischargeability under § 523(a)(6) is an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on a contractual basis.

*Friendly Fin. Serv. Mid-City, Inc. v. Modicue (In re Modicue)*, 926 F.2d 452, 453 (5th Cir. 1991), (citations omitted). This rule has been followed consistently. *See* William I. Norton, Jr., 3 Bankruptcy Law & Practice § 47:48 at 47-140 (2d ed. 2005) (collecting authorities).

As discussed above, Salvino owed Acquisition a contract debt of $1.5 million, but Acquisition failed to show any tort damages. Accordingly, even if breach of the employment contract had been tortious, Acquisition would not be entitled to a judgment of nondischargeability under § 523(a)(6).

## Conclusion

For the reasons stated above, judgment will be entered, through a separate order, in favor of Salvino on all counts of Acquisition's complaint.[12]

Dated: July 9, 2007

Eugene R. Wedoff
United States Bankruptcy Judge

---

[12] In addition to the dischargeability claims addressed in this opinion, Acquisition's complaint requested a judgment declaring that Salvino's duties and obligations under a covenant not to compete are non-dischargeable under 11 U.S.C. § 727(b) and that the automatic stay does not preclude the enforcement of the covenant not to compete. However, Acquisition did not raise these claims at trial or in post-trial argument and so has waived them. *See Roche v. City of Chicago*, 24 F.3d 882, 886-87 (7th Cir. 1994).